# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

# BATON ROUGE DIVISION

| | | |
|---|---|---|
| **SEAHAWK LIQUIDATING TRUST, as**<br>**Trustee of Seahawk Drilling, Inc.** | : | **DOCKET NO. 3:12-081** |
| **VS.** | : | **JUDGE TRIMBLE** |
| **CERTAIN UNDERWRITERS AT**<br>**LLOYDS, LONDON, ET AL** | : | **MAGISTRATE JUDGE KAY** |

## TRIAL OPINION

Trial of this matter was held from September 8, 2014 through September 10, 2014; all parties were represented. The parties have submitted their post trial briefs as requested by the undersigned and the matter is ripe for decision.

### PARTIES

The J/U SEAHAWK 3000 is a three-legged jack-up drilling rig owned by Seahawk Drilling Liquidating Trust as Trustee for Seahawk Drilling, Inc. ("Seahawk")[1] Seahawk brought this Complaint in admiralty against defendants, Certain Underwriters at Lloyds, London, Ace European Group Limited, National Union Fire Insurance Company of Pittsburgh, PA, Axis Specialty Europe Limited, Lancashire Insurance Company, Swiss Re International SE, Aspen Insurance UK Limited, Berkley Insurance Company, Arch Insurance Company, and International Insurance Company of

---

[1] Seahawk Drilling Liquidating Trust is the successor in interest to the First Amended Plan of Reorganization of the Debtors and Debtors-in-Possession under Chapter 11 of the Bankruptcy Code confirmed by an order entered on September 28, 2011 in the bankruptcy case of In re SeahawkDrilling, Inc., et al, Case No 11-20089-RSS in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division.

Hannover, LTD, Hudson Specialty Insurance Company, Navigators Insurance Company, New York Marine & General Insurance Company and Torus Insurance Company (collectively referred to as "defendants").

## FACTUAL BACKGROUND

Seahawk Drilling owned and operated a fleet of mobile offshore shallow water jack-up drilling rigs that operated in the United States Gulf of Mexico and off the coast of Mexico. Defendants issued a Cover Note (MS-S 3089)to provide insurance coverage to Seahawk for its operation of that fleet of drilling rigs. The Cover Note which listed the J/U SEAHAWK 3000 covered the period of June 30, 2009 to June 30, 2010; the underwriters to this note are  Ace European Group Limited, National Union Fire Insurance Company of Pittsburgh, PA, Axis Specialty Europe Limited, Lancashire Insurance Company, Swiss Re International SE, Aspen Insurance UK Limited, Berkley Insurance Company, Arch Insurance Company, and International Insurance Company of Hannover, LTD. A separate Cover Note (MS-S 3394) covered the period in effect from June 30, 2010 until June 30, 2011. The underwriters to this Note are Hudson Specialty Insurance Company, Navigators Insurance Company, New York Marine & General Insurance Company and Torus Insurance Company. It is undisputed that both policies provide for a $10 million per occurrence deductible.

## INCIDENTS

In February 2010, after completing a drilling contract in the Bay of Campeche, the SEAHAWK 3000 (sometimes referred to as the "rig") began its tow to the United States Gulf of Mexico. Due to inclement weather while in tow, on three separate occasions between February 10, 2014 and  February 28, 2010, the rig movers were forced to jack  up the rig in shallow water until

2

the rough weather passed. At some point in time, the rig began experiencing problems with the jacking system that prevented it from being able to properly jack up out of the sea. An inspection of the rig revealed damage to a fixed pin in the jacking system and damage to the yoke guides on the jacking system.

On March 3, 2010, while attempting to jack the rig down, noises were heard which indicated further damage. The rig was towed to the Gulf Copper Shipyard in Galveston for repairs to the Bow Leg Jacking System. On April 8, 2010, the rig was towed from Galveston to South Marsh Island Block 77 on the Outer Continental Shelf to complete a drilling contract (the "Hilcorp contract"). On April 13, 2010, the rig arrived at South Marsh Island Block 77; it was unable to jack past a 19 foot air gap due to complications with the jacking system. On April 15, 2010, additional repairs were made, but because the rig could not continue jacking up, Seahawk substituted another jack up drilling rig to complete the Hilcorp contract. The Hilcorp contract provided for a daily operating rate of $55,000 for the SEAHAWK 3000; it was stipulated that the contract would last from 78 to 90 days.[2] A substitute rig was provided to perform under the contract for $41,000 per day.

On April 29, 2010, the firm of Fugro Chance conducted a laser survey of the three (3) rig legs. This survey was interpreted by plaintiff's expert, Mr. Webster, as indicating a variance at the top of the legs of 40 inches, exceeding the permissible tolerance of six inches by 34 inches.[3] Seahawk chose not to repair the legs because the cost would have exceeded the salvage value of the rig.[4]

---

[2] Stipulation, Exhibit B, Para 24.

[3] Tr. p. 136.

[4] Tr. p. 402.

On or about May 24, 2010, the rig was moved to South Marsh Island 1 to complete repairs after which on or about July 4, 2010, it was towed to Eugene Island Block 334 to perform another drilling contract. On July 5, 2010, the rig again encountered problems with the jacking system in that it could only be jacked to 60 feet; consequently, in an effort to jack the rig to the appropriate height, the crew made the conscious decision to jack it out of level. On July 6, 2010, the rig began drilling operations for Energy XXI, and after completion of that contract, the rig was towed to East Cameron 334.

While in tow, on or about July 21, 2010, the rig encountered inclement weather. An attempt to jack out of the water resulted in part of the rig falling into the water. The rig then was subjected to bad weather conditions for a period of at least 24 hours without being fully jacked out of the water. A decision was made to tow the rig to West Cameron Block 38 in order for United Marine to survey the damage. After inspection, it was decided to move the rig to AMFELS shipyard in Brownsville, Texas and have it dry docked for further repairs. After repairs in drydock, the rig was moved back to West Cameron Block 38 to complete additional repairs.

CLAIMS

Seahawk seeks (1) all insurance proceeds due it under Cover Notes 3089 and 3394, (2) loss of charter hire resulting from the termination and/or cancellation of drilling contracts under Cover Notes 3089 and the 3394, and the Loss of Contract Endorsement under both Cover Notes, (3) bad faith breach of contract of Cover Note 3089 and 3394 pursuant to Louisiana Civil Code articles 1994, 1995, and 1997, (4) breach of duty of good faith and fair dealing pursuant to Louisiana Revised Statute 22:1973 (A) and (B)(1), and (5) penalties and attorneys fees pursuant to Louisiana Revised Statutes 22:1973 and 22:1892 and under any other applicable law.

4

Seahawk relies on the following contract clauses. The Cover Notes provide the following pertinent provisions:

### SECTION I.A - HULL & MACHINERY–INSURING CONDITIONS INSURING CLAUSE

> This insurance is against all risks of direct physical loss of or physical damage to the property insured, subject to the terms, conditions and exclusions contained herein, and/or American Institute Hull Clauses (June 2, 1977). . ..[5]

The Liner Negligence Clause reads as follows:

> In consideration of Additional Premium of $INCLUDED, it is understood and agreed that the ADDITIONAL PERILS (INCHMAREE) clause of the attached Policy is deleted and in place thereof the following inserted:

> Subject to the conditions of this Policy, this insurance also covers:

> a.     Breakdown of motor generators or other electrical machinery and electrical connections thereto: busting of boilers; breakage of shafts; or any latent defect in the machinery or hull;

> b.     Loss of or damage to the subject matter insured directly caused by:

> 1.     Accidents on shipboard or elsewhere, other than breakdown of or accidents to nuclear installations or reactors on board the insured vessel;

> 2. Negligence, error of judgment or incompetence of any person;

excluding under both "a" and "b" above only the cost of repairing, replacing or renewing *any part* condemned *solely as a result of a latent defect, wear and tear, gradual deterioration* or fault or error in design or construction;

provided such loss or damage (either as described in said "a" or "b" or both) has not resulted from want of due diligence by the Assured(s), the Owner(s) or Manager(s) of the Vessel, or any of them. Masters, mates, engineers, pilots or crew not to be

---

[5] Joint Exhibit 1. R. #75-2; Plaintiff's Exhibit 1; Plaintiff's Exhibit 2.

considered as part owners within the meaning of this clause should they hold shares in the Vessel.[6]

Defendants rely on the following contract provisions:

## DEDUCTIBLES

. . .

For the purpose of this Clause, each occurrence shall be treated separately, but it is agreed that a sequence of losses or damages arising from the same occurrence shall be treated as one occurrence.

Damage due to heavy weather or navigating through/operating in ice which has arisen during one stay in port or during one operating period counts as one occurrence. In this respect an operating period shall be understood as the period between the unit's departure from port and its departure from the first location where it has been operating ("Operating Location"), the period between this departure from one operating location and the arrival at port, or in cases where no operating arrival at the next port, provided that if the unit is staying at a location for more than ninety (90) consecutive days, the deductible shall apply to each period of ninety (90) days.[7]

## SEVENTY-TWO HOUR CLAUSE - (Not Applicable to Named U.S. Gulf Of Mexico Windstorm) as defined herein.

It is hereby agreed that all loss of or damage to property occurring during any one period of seventy-two consecutive hours during the currency hereof, directly caused by windstorm or hail, hurricane, typhoon, tornado, earthquake, tsunami or seaquake and/or volcanic eruption shall be deemed to have been caused by a single event and therefore to constitute one loss for the purpose of this insurance.

The Assured shall select the time from which any such period shall commence, but no two such selected periods shall overlap.

Whatever period of seventy-two consecutive hours is used for the purpose of this Clause shall also be used for the purposes of any excess provisions in this Policy.[8]

---

[6] Id. Clause 23.f(iii)(emphasis added), of the **SECTION I.A. HULL & MACHINERY**.

[7] Id. Clause 21.

[8] Id. Clause 31.

At the trial of this matter, Seahawk called as its witnesses, Geoff Webster and Crane Zumwalt; both were experts. Mr. Webster testified as an expert in the field of marine engineering, naval architecture, marine surveying, forensic engineering and marine casualty insurance adjustment of losses. Mr. Zumwalt testified as an expert in the design, construction and operation of marine offshore drilling units including mat supported jackup rigs. Defendants called Malcolm Sharples who was accepted as an expert, limited to jackup rig cracks at the mat/leg connections. Also relied upon was the deposition testimony of the experts and William Vandergriff, an employee of Hannon Hydraulics who inspected the hydraulic system after the February 28 incident and was involved in the repairs to the system. Mr. Vandergriff also worked on the rig before the incidents made the basis of the suit.

For purposes of the trial of this matter, plaintiff and defendants made the following stipulations:

## JOINT STIPULATIONS

(1) Invoices (a) for repair of corrosion unrelated to physical damage ($262,081.91), (b) inapplicable to the claim and or not identified as being related ($632,251.27) (c) for modifications/betterment/work not installed ($489,979.55) (d) relating to operation locations unrelated to any insured repairs ($312,404.25) and (d) duplicate invoice ($218,976.49) in the total amount of $1,915,693.47 is not recoverable.[9]

## POST TRIAL STIPULATION

Plaintiff and defendants stipulate that if this court holds that the events of February and April 2010,

---

[9] The parties also amended ¶ 54 of a previously entered stipulation R. #75-2. (R. #125).

and the events of July 21, 2010 are considered as two separate occurrences, which plaintiff respectfully denies, then plaintiff's claim with respect to each occurrence, if viewed separately, is less than the deductible applicable to that occurrence.[10]

## ISSUES

(1) Are the events of February 28 and July 21 separate occurrences?

(2) Has Seahawk proven its physical damage claim?

(3) Has Seahawk proven its claim under the Loss of Contract Endorsement?

## DISCUSSION OF LAW AND EVIDENCE

*Were there two occurrences?*

The policies require that each occurrence be treated separately and further provides that losses or damages arising from the same occurrence are to be treated as one occurrence. The policies also provide that losses occurring in one operating period are a single occurrence, and that all heavy weather losses occurring within 72 hours are a single occurrence. Defendants' position is that there are two separate occurrences– one on February 28, 2010 and another one on July 21, 2010; thus defendants posit that Seahawk has not proven that $10 million of repairs are attributable to a single occurrence.

Seahawk, on the other hand, argues that it has met its burden of proving that the damages to the Fabreeka, hydraulic system and mat/let connections to the SEAHAWK 3000 were more likely than not caused by having to jack the rig up out of the water at safe locations in inclement weather on February 10, 21 and 28, 2010. Thus, if Seahawk has met this burden, the burden would shift to defendants to prove that these damages were caused by an event excluded under the Cover Note.

---

[10] R. #133.

Seahawk must prove that the sequence of losses or damages arose from the February 28, 2010 event. In a leading treatise on marine insurance, Burglass writes:

> The occurrence within the meaning of a deductible average clause is one of fact and depends not on the lapse of time between the various incidents but whether series of incidents giving rise to a series of damages to the subject-matter insured constitute one accident, casualty or:
>
> (a) they are the result of the same act or negligence (if negligence was involved), or
>
> (b) there is an unbroken connection between each incident which caused damage; that is to say were the subsequent incidents inevitable (or at the very least something which might be expected to happen once the first incident took place).[11]

* * *

> Progressively developing damages emanating from a single cause, even although the damage becomes steadily greater over a protracted period, until the cause is traced and effectively dealt with. There may, however, be difficulty where in relation to complex modern ship's machinery, it is considerable time before the basic cause is eventually identified (for example where some parts are slightly out of alignment), even though partial repairs have been effective in the meantime without curing the originating trouble.[12]

Burglass also adds that:

> It is usually considered that if there is an intervening act of unconnected negligence between the various incidents, or the sequence of cause and effect is broken by the intervention of a new, unconnected, and unexpected incident, then the various incidents cannot be said to constitute one accident, casualty, or occurrence.[13]

In Federal Ins. Co. v. Bock,[14] the court recently held that the proximate cause of an event is "that cause which in a natural and continual sequence unbroken by any new and intervening cause,

---

[11] LESLIE J. BURGLASS, MARINE INSURANCE GENERAL AVERAGE IN THE UNITED STATES, 2ED. (1981), p. 124.

[12] Id. at p. 125.

[13] Id. at p. 140.

[14] 382 S.W.2d 305, 307 (Tex.Civ.App.–Corpus Christi 1964).

produces a loss, and without which the loss would not have occurred." The evidence establishes that after the February 2010 incident, repairs were made to the SEAHAWK 3000, and another event happened on April 12, 2010 after which the rig was again repaired. On April 29, 2010 laser survey confirmed the legs to be bent causing misalignment well beyond the allowable tolerance. With full knowledge of this condition Seahawk made the conscious decision not to repair the legs and to continue operating the rig. Thereafter, the rig was successfully jacked up and completed a drilling job at East Cameron 275. On July 21, the rig encountered more inclement weather; the crew attempted to jack the rig up in sea conditions that were in excess of what was permitted by the rig's operating manual; parts of the rig including the pins from the bow and starboard legs and the hull fell into the heavy seas and remained there for over 24 hours; and again the rig suffered more damage.

The evidence is undisputed that the rig was able to perform successfully at East Cameron where the rig jacked up in calm waters but had to do so unevenly because of the bent legs. After the lapse of five months from the first incident, the rig was subjected to another inclement weather event. Since the July 21st event and after substantial repairs were made to the rig which did not include correcting or repairing the misaligned legs, the rig has operated for the past three and a half years without incident. The court concludes that this second event of July 21 is an intervening act which is clearly a separate occurrence.

The testimony of Mr. Zumwalt, plaintiff's own expert, appears at Page 491, as follows:

Q.     Now, if I understand your testimony about the incident of July 21st, would it be accurate to say that if the weather had been calm on July 21st, the rig should have been able to jack up?

A.     Yes.

10

Q. And once the rig fell off the pins, if the weather had been calm, you'd have been able to get back on the pins, wouldn't you?

A. If it would have happened in calm, yes. That's a relative thing.

Mr. Zumwalt's testimony continues in pertinent part as follows:[15]

Q. But if there hadn't been heavy weather there would -- if there hadn't been heavy weather, there wouldn't have been any damage at all?

A. No. And the rig's been jacking up and down for the past three and a half years without any incidents at all, but they always jack in calm weather. The rig always jacks in calm weather now with low seas. I told them how to do that.

Imagine an automobile accident where an insured driver is solely at fault and serious personal injuries caused claimants to completely deplete the policy liability limits. The insured's vehicle is repaired. Two months later, he is made aware that there is a problem with the braking system related to the accident. That problem should be corrected in order for the brakes to operate safely. Since he has driven his vehicle for two months without occurrence, the insured elects not to have the suggested brake work done. Three months later, and during the same policy period, the brakes fail causing serious injuries to the occupants of another vehicle. When claims are asserted by the victims, the insurance company takes the position that the brakes were damaged in the original accident, their personal injury liability limits having been exhausted, and there is no additional personal injury liability coverage available because this is one occurrence. This Court cannot imagine any court in the United States that would accept such an argument.

The evidence clearly shows that the key to operating this rig in its impaired condition is jacking it up in calm waters. But for the storm and heavy seas on July 21st, there would have been

---

[15] Tr. p. 493.

no "occurrence" and no further damage to this rig. Whatever damages were repaired after July 21, 2010 were caused by the storm of that date. This results in two ten million dollar deductibles applicable under the policies.

The parties have stipulated[16] that if the court finds that damages were caused by two separate occurrences, then no single occurrence would exceed the amount of the deductible. In view of this stipulation and the findings of the court as stated above, the court will deny all of plaintiff's claims for damages to the rig. This conclusion renders the second issue stated above moot.

## LOSS OF CONTRACT

The Cover Notes contains a Loss of Contract Endorsement which provides as follows:

> In consideration of the premium charged herein, Underwriters hereon specifically agree that ***the scope of coverage hereunder shall include the loss of charter hire resulting from the termination and/or cancellation of the Assured's drilling contract(s) caused by the insured drilling units being unable to operate following a claim recoverable under SECTION I.A if the deductible were nil.*** In the event of termination and/or cancellation of the Assured's drilling contract(s) as above, the Assured shall exert all reasonable efforts to re-contract the drilling unit in order to aver or minimize the insured loss to Underwriters and the Assured shall be entitled to reimbursement from Underwriters for mobilization, towage, re-outfitting or similar expenses necessary to re-contract the drilling unit subject to prior approval of such expenses by Underwriters if the replacement drilling contract(s) is (are) for lower daily charter hire than the drilling contract(s) lost by the Assured. Underwriters shall be liable for the differential in daily charter hire between the replacement drilling contract(s) and the drilling contract(s) lost, limited to the insured amount less any compensation paid as loss of hire under this Policy.[17]

The Policy defines a claim as follows:

> The word "Claim", wherever used in this Policy, shall mean that part of each

---

[16] R. #133.

[17] Plaintiff's exhibit 1, p. 102 (emphasis added).

12

written demand received by the "Insured" [sic][18] for damages, . . . .[19]

Seahawk is making a claim for damages for the loss of the Hilcorp contract at South Marsh Island Block 77 in April 2010. The J/U SEAHAWK 3000 arrived at South Marsh Island in April 2010 to perform drilling operations at a daily drilling rate of $55,000.[20] On arrival at South Marsh Island Block 77, additional problems were encountered with the jacking system; the bow leg was rubbing against the jack house roof and the bow yoke was out of level.[21] On April 10-13, United Marine conducted a damage survey of the J/U SEAHAWK 3000 and submitted a lump sum bid dated April 16 to repair the items it noted in its survey. These repairs were carried out at South Marsh Island Block 77 and then at South Marsh Island Block 1.[22] On or about April 12 2010, Rick Storey (Seahawk's Director of Marketing) was informed that the J/U SEAHAWK 3000 arrived on location but could not continue with operations due to the rig's inability to jackup.[23] On April 19, 2010, Greg Lalicker, Executive Vice President of Hilcorp, sent a letter advising that "numerous mechanical problems were visible, including malfunctions with the rig's hydraulic jacking system which further damaged the rig when Seahawk attempted to jack the rig up out of alignment."[24]

---

[18] The court is of the opinion that this word must be "Insurer" rather than "Insured."

[19] Id, p. 115, ¶ 7.

[20] Joint Stipulation, ¶ ¶ 22 and 23, Attached to defendants' Pre-trial Statement as exhibit B, (R. #75-2).

[21] Id., ¶ 35.

[22] Id. ¶ 26.

[23] Id., ¶ 27.

[24] Id., ¶ 28.

Because the rig was unable to jack up out of the water, Hilcorp canceled the contract on April 19, 2010 and Seahawk provided a substitute drilling rig at a lower drilling rate of $41,000 per day.[25] The parties stipulated that it was anticipated that the drilling rig contract for the J/U SEAHAWK 3000 would have lasted from 78 to 90 days.[26] The substitute drilling rig completed its obligations under the contract.[27]

At trial of this matter, Seahawk presented evidence that problems with jacking the rig out of water was due to both the hydraulic system and the legs being out of alignment. Specifically, Mr. Zumwalt testified as follows:

> Q.    I want to talk about the Hilcorp contract at South Marsh Island 77 before the rig was asked to leave because it couldn't get jacked up, were the problems with the jacking system the sole reason why the SEAHAWK 3000 could not get jacked up to the proper height to commence the drilling project for Hilcorp Corporation–
>
> A.    No.
>
> Q.    - - the Hilcorp contract?
>
> A.    No.
>
> Q.    What else?
>
> A.    The legs being out of alignment.[28]

However, Mr. Zumwalt also testified that the rig had experienced continuous problems with

---

[25] Id. ¶ 31.

[26] Id., ¶ 24.

[27] Id., ¶ 32.

[28] Tr. p. 500:5-16.

the jacking system for 20 to 30 years.[29] Mr. Zumwalt further testified that he did not know if the problems with the jacking system had been repaired prior to the February 2010 incident.[30] A rig mover's report dated July 2009 indicates that problems with the hydraulic system had not been resolved.[31]

In his deposition, prior to trial, Mr. Zumwalt testified that none of the repairs to the hydraulic system had anything to do with physical damage.[32] At trial, Mr. Zumwalt changed his testimony and stated that the damage to the hydraulic system was due to physical damage, but when asked by the court to explain his position, Mr. Zumwalt testified that what he was attempting to say at his deposition was that the vast majority of the work was due to wear and tear.[33] Mr. Zumwalt further explained that at the time of his deposition, he was sick.[34] Finally, Mr. Zumwalt testified at trial that he did not know the condition of the jacking cylinders prior to the February incident.[35]

William Vandergriff, an employee of Hannon Hydraulics testified in his deposition as to his observations of the condition of the hydraulic system. Mr. Vandergriff had been involved in repairs to the system both prior to the February 28, 2010 incident and after the incident. Mr. Vandergriff testified that he had inspected the jacking system both prior to and after the February 28, 2010

---

[29] Tr. pp. 378-379.

[30] Id.

[31] Tr. p. 378-379.

[32] Zumwalt depo. p. 183, lns 8-12; Tr. p. 390.

[33] Tr. p. 390.

[34] Id.

[35] Tr. p. 391, lns 8-11.

incident; he observed that the condition of the rig after the February 28, 2010 incident was the same as it was before it left for Mexico.[36] [37] Mr. Vandergriff further testified that the condition of the hydraulic system that he observed was attributed to ordinary wear and tear and corrosion due to being in a salt water environment over a period of time.[38]

Plaintiff's expert, Mr. Webster, testified on direct examination that the February 2010 storm, in his opinion, resulted in severely compromising all of the components of the jacking system, including the hydraulics, the cylinders, and the units.[39] The Court notes that Mr. Webster was willing to voice his opinion despite the fact that he had never been on the rig in question, had never seen the hydraulic system or any of its components, and had never even seen any photographs of the hydraulic components.[40] The Court is left wondering how Mr. Webster could arrive at such an opinion without furnishing any specific facts upon which to base it. The Court does note that Mr. Webster, prior to Hurricane Katrina in 2005, spent about sixty percent (60%) of his time on "legal work." Since Katrina, he has spent all of his time doing "legal work," which the Court interprets as testifying for clients who engage his services.

The Court must state that significant doubt regarding Mr. Webster's testimony was cast by the testimony of defense expert, Mr. Sharples. First off, the Court notes as pointed out by plaintiff's counsel that at the trial, when Mr. Sharples was tendered as an expert, the Court did comment that

---

[36] The Bay of Campeche to perform drilling operations in 2008.

[37] Vandergriff deposition pp. 18-19.

[38] Vandergriff deposition, pp. 7,8, 10, 24.

[39] Tr. p. 86 and 87.

[40] Tr. p. 192.

his testimony would be viewed with "considerable skepticism." It is regrettable that the undersigned violated the cardinal rule of judicial conduct in making such a comment before hearing what Mr. Sharples said and assessing his demeanor as he said it. The Court in all jury cases cautions juries not to form any opinion concerning the evidence until it has heard all of the testimony and seen all of the evidence to be offered. Mr. Sharples had been tendered as an expert in drilling rigs generally. After considerable examination by counsel and the Court, the Court, noting his limitations as pertaining to this case, permitted him to testify only with respect to the alleged "cracks" at the mat/leg connections. Having heard and observed Mr. Sharples, and particularly having heard his explanations of the ABS test inspection reports concerning the cracks at the mat/leg connections, the Court finds that the explanation provided by Mr. Sharples comports with the test reports and successfully rebuts and contradicts the testimony of Mr. Webster regarding these "indications" which Mr. Webster was willing to label "cracks." In other words, the Court finds that Mr. Webster grossly exaggerated the alleged damage as cracks at the mat/leg connections in his testimony.

On this particular issue, Mr. Webster's testimony was so successfully controverted as to make this Court leery of Mr. Webster's testimony in general. Coupled with Mr. Webster's complete unfamiliarity with the rig's hydraulic system, how securely it was housed, its appearance either before or after the February storm and the lack of any sound factual basis to support his testimony about damage to the hydraulic system, this Court simply cannot accept that testimony as establishing hydraulic system damage in the February storm by a preponderance of the evidence. It is the opinion of the Court that the evidence in fact preponderates in favor of the defendants that the hydraulic system was not in fact damaged in the February storm but that it suffered problems of long standing attributable solely to ordinary wear and tear. The testimony of Mr. Zumwalt and Mr. Vandergriff

strongly supports this conclusion.

The legs of the J/U SEAHAWK 3000 were surveyed by Chance Fugro on April 29, 2010 after it was unable to jack out of the water for the Hilcorp contract.[41] Mr. Webster interpreted the survey to indicate that the variance at the top of the legs was 40 inches; the allowable tolerance is 6 inches.[42] This evidence was not disputed. Mr. Zumwalt also testified about the laser survey of the legs on April 29, 2010 as follows:

> Q.    That was the first scientific or objective evidence that you're aware of that the legs of the rig were bent?
>
> A.    Yes. . . .
>
> Anyway, so people would come down. A lot would say, "Gee, the legs look like they're not straight to us." We said, "Oh, not possible." So we began to find the problems like South Marsh Island 77, we're going to find out. Then we say, we need to call out Chance, have them do a sophisticated laser survey of the legs from the helideck and see if these legs are really – because you can't see – naked eye – naked eye is deceiving . . . .
>
> So anyway, we call Chance out. I call Chance out. They came out and did the laser surveys and did the reports. We did reports three more times – surveys three more times, be sure we hadn't done it wrong. Each time it showed the same results within a small margin error.[43]

---

[41] Tr. 135:24-136:17; exhibit 29.

[42] Tr. 136:23-137:7.

[43] Tr. 294:11-295:14.

Defendants rely on Texas law and the insurance law doctrines that apply when a loss is caused by both an insured and an excluded peril. The doctrine of concurrent causes limits an insured's recovery to the amount of damage caused solely by the covered peril.[44] Because an insured can recover only for covered events, the burden of segregating the damage attributable solely to the covered event is a coverage issue for which the insured carries the burden of proof.[45] In Guraranty National Ins. Co. v. North River Ins. Co.,, the court held that "an insurer is not liable . . . when a covered peril and an excluded peril concurrently cause a loss."[46] If the loss would not have occurred but for the excluded peril, either independently or in concert with the insured peril, the insured cannot recover anything unless it can prove how much of the loss would have occurred solely as a result of the covered peril.[47] Defendants argue that Seahawk's claim under the Loss of Contract Endorsement is governed by the concurrent cause doctrine rather than the independent cause doctrine because the evidence shows that any misalignment of the legs was insufficient by itself to cause any damage to the rig or to prevent the rig from jacking up. Defendants remark that any misalignment to the legs have not been repaired and Seahawk does not intend to repair the legs because it would not be cost efficient.[48] Furthermore, the SEAHAWK 3000 has been able to jack up and perform

---

[44] Wallis v. United Svcs. Auto. Ass'n, 2 S.W.3d 300, 303 (Tex.App.–San Antonio 1999, pet. denied).

[45] Id.

[46] 909 F.2d 133, 137 (5th Cir. 1990).

[47] Wallis v. United Svcs. Auto. Ass'n, 2 S.W.3d at 303.

[48] Tr. p. 403 (the cost of repairing the bent legs would have exceeded the salvage value of the rig).

drilling operations for the past three and a half years without incident.[49]

The court agrees with defendants and finds that the problems with the hydraulic system and the misaligned legs were concurrent causes of the damage to the rig and the loss of contract claim. Thus, the concurrent cause doctrine is triggered. United Marine performed the repairs after the February 28 and April 12 incidents under a lump sum contract. Both Zumwalt and Webster testified that it would be impossible to determine how long it would take to repair both the insured and uninsured damage and/or segregate these repairs.[50]

The court concludes from the evidence, or more correctly the lack thereof, that Seahawk has failed to prove what percentage, if any, of the inability to jack up the rig at South Marsh Island Block 77 was due to the bent legs. The "if any" remark is due to the fact that the legs have never been repaired, a contract was completed prior to the July 21 storm with the bent legs, and the rig by Seahawk's own evidence has been operating without the legs being repaired by simply changing the method of jacking the rig up. Without even relying on the "concurrent cause" doctrine, this court cannot find by a preponderance of the evidence that bent legs was a cause in fact of the inability of the subject rig to perform its contract in April of 2010.

## ATTORNEY FEES

In view of the above rulings in favor of the defendants, the claim for attorney fees is moot.

## CONCLUSION

In accordance with the above, judgment will be rendered in favor of defendants, Certain Underwriters at Lloyds, London, Ace European Group Limited, National Union Fire Insurance

---

[49] Tr. p. 493, lns. 1-7.

[50] Tr. pp. 208, 422, and 424.

Company of Pittsburgh, PA, Axis Specialty Europe Limited, Lancashire Insurance Company, Swiss Re International SE, Aspen Insurance UK Limited, Berkley Insurance Company, Arch Insurance Company, and International Insurance Company of Hannover, LTD, Hudson Specialty Insurance Company, Navigators Insurance Company, New York Marine & General Insurance Company and Torus Insurance Company and against plaintiff Seahawk Drilling Liquidating Trust as Trustee of Seahawk Drilling, Inc., dismissing all of plaintiff's demands. All costs in this case will be assessed against plaintiff.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this _16th_ day of March, 2015.

_____
JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE